DEMSEY & ASSOCIATES, Inc. and Interstate Steel Company, Plaintiffs-Appellees,

v.

S.S. SEA STAR, her engines, boilers, etc., World Bulk Shipping Ltd., Atlantic Marine Enterprises, Inc., and Pittston Stevedoring Corp., Defendants-Appellants,

v.

The JORDAN INTERNATIONAL CO., Defendant-Impleaded-Appellant.

Nos. 339, 340, 341, 342, Dockets 35354, 35355, 35356, 35357.

United States Court of Appeals, Second Circuit.

Argued Jan. 11, 1972.

Decided May 16, 1972.

Alan S. Loesberg, New York City (Hill, Rivkins, Warburton, McGowan & Carey, New York City, on the brief), for plaintiffs-appellees.

Renato C. Giallorenzi, New York City, for defendant-appellant World Bulk Shipping Ltd.

Edwin K. Reid, New York City (Howard M. McCormack and Zock, Petrie, Sheneman & Reid, New York City, on the brief), for defendants-appellants S. S. Sea Star and Atlantic Marine Enterprises, Inc.

Paul Falick, New York City (John L. Quinlan and Bigham, Englar, Jones & Houston, New York City, on the brief), for defendant-appellant Pittston Stevedoring Corp.

Morris Rosoff, New York City (Rosoff & Rosoff, New York City, on the brief), for defendant-impleaded-appellant The Jordan International Co.

Before MEDINA, KAUFMAN and TIMBERS, Circuit Judges.

MEDINA, Circuit Judge:

The Jordan International Co. and The Eastern Steel & Metal Co., as joint venturers, were engaged in the business of soliciting, purchasing, selling and importing Mexican steel into the United States.

Demsey & Associates, Inc. ordered 463 secondary hot rolled steel coils from Eastern by purchase order dated July 3, 1963 and invoice dated August 15, 1963. Interstate Steel Company ordered 691 prime hot rolled steel coils from Eastern by purchase order dated May 2, 1963 and invoice dated August 15, 1963. Demsey

and Interstate opened irrevocable letters of credit payable on presentation of clean-on-board bills of lading. The coils were obtained by Eastern from Altos Hornos de Mexico, S.A., of Monclova, Mexico.

To fulfill the purchase orders, Jordan (Eastern's joint venturer) sought to charter a vessel for the carriage of the coils from Tampico, Mexico to Cleveland for Demsey and to Chicago for Interstate. Accordingly, Jordan approached World Bulk Shipping Ltd., an operator of time chartered vessels.

On July 24, 1963, World Bulk time chartered the S. S. Sea Star from her owner, Atlantic Marine Enterprises, Inc., for the carriage of cargo from Tampico for a period of two-three months. On the same day, World Bulk voyage chartered the vessel to Jordan, from one safe berth Tampico to one safe berth Cleveland and Chicago, for a cargo of 5,000 tons of steel coils.

The time charter between Atlantic and World Bulk provided that upon the delivery of the vessel at Tampico, she was to be "tight, staunch, strong and in every way fitted for the service * * *." Clause 8 of the time charter provided:

> The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and agency; and Charterers are to load, stow, and trim the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading for cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

World Bulk was to provide the necessary dunnage and shifting boards, and the time charter was subject to the "U.S.A. Clause Paramount."

The voyage charter between World Bulk and Jordan provided that the cargo was "to be loaded, stowed and discharged free of risk and expense to the vessel," and that the "U.S. Clause Paramount" and the "New York Produce Exchange Arbitration Clause" were to be incorporated therein.

The coils were shipped by rail from Mexico City and Monclova to Tampico, where the Sea Star was waiting, in August, 1963. At time of loading, the coils were properly and adequately strapped for the voyage, but they were in a rusted condition.

The stowage plan, prepared by Representaciones Maritimas, S. A., World Bulk's agent, provided that the coils consigned to Interstate were to be stowed in Nos. 1–5 lower holds, and the coils consigned to Demsey were to be stowed in Nos. 1–5 lower holds, above the Interstate coils, and in Nos. 1, 2, 4, 5 'tween deck. The 'tween deck hatch covers were old and dry, so the chief officer instructed the stevedores not to stow any coils on top of the hatch covers.

When it appeared that the letter of credit arranged by Interstate in favor of Eastern would expire, Jordan asked World Bulk to issue clean-on-board bills of lading in return for indemnity against any consequences arising from the issuance of such bills. Accordingly, on August 16, 1963, Representaciones, World Bulk's agent, issued three bills of lading (two with respect to the coils ordered by Interstate and one with respect to the coils ordered by Demsey). Each bill of lading was signed by Representaciones, "for the Master," and stated that the coils were shipped at Tampico "in apparent good order and condition" and were "received on board—clean on board." This was done in spite of the fact that the coils were in a rusted condition. Moreover, neither World Bulk nor Representaciones had the authority to sign bills of lading on behalf of the Master.

After the issuing of the bills of lading, Jordan wrote World Bulk a letter, dated August 19, 1963, stating that Jordan agreed to

> be fully responsible for all consequences arising out of the release of clean onboard Bills of Lading by you to us, notwithstanding:
>
> a) any rust which may be on the outside and on the inside of the coils,

b) the premature release of these Bills of Lading inasmuch as loading is expected to be completed only on August 20th or 21st.

The plaintiffs were unaware of the rusted condition of the coils at the time of loading.

The Sea Star sailed from Tampico on August 21, 1963, and arrived in Cleveland on September 27, 1963. When the hatches were opened, substantial damage to the Demsey coils was found, such as crimping, bending, telescoping and the breaking and loosening of the bands in both the 'tween deck and the lower hold. An inspection by a marine surveyor revealed that improper chocking and stowing caused the coils to shift during the voyage, and that much of the damage was caused by coils rolling into one another. Further damage was caused by one or more coils falling through the defective 'tween deck hatch covers into the hold below. There was improper stowage in several respects. While the coils in the 'tween deck were placed in the wings and not on top of the defective hatch covers, there was a failure to chock and shore these coils with the plainly foreseeable result that during the voyage from Tampico the heavy coils started to roll around in the 'tween deck, hitting one another, and one or more of them rolled over the defective hatch covers and broke through, falling upon the other coils stowed in the hold below. In addition, there was a failure properly to stow the entire batch of coils in the hold, with resulting extensive damage caused by the shifting of the coils. While Judge Bonsal made proper findings on this subject, he erroneously concluded, as we shall see, that a broad distinction with respect to liability could be made between the damage in the 'tween deck and the damage in the hold. As will be explained in more detail later, it is clear to us that all the injury to the coils, except rust and the damage caused by the discharge of cargo at Chicago by Pittston, was caused by improper stowage in the 'tween deck and in the hold. Whether there should be some additional indemnity or contribution between some of the parties with respect to the specific damage caused by the falling of one or two coils through the defective hatch covers into the hold by reason of the unseaworthiness of the defective hatch covers must be left to the remand. We have nothing before us to warrant a definitive ruling on this point. It may prove so difficult to ascertain the extent of this particular damage or it may be of so minor a character that the parties may decide to overlook it. Following the survey, the Demsey coils were discharged and the vessel proceeded to Chicago.

Upon the arrival of the Sea Star in Chicago, on October 1, 1963, the coils were inspected prior to discharge. This inspection revealed that the Interstate coils suffered damage similar to that suffered by the Demsey coils. In addition, sixty-four of the Interstate coils were found to be excessively rusted and pitted.

The coils were discharged by Pittston Stevedoring Corp., which used bare wire slings without spreader bars or other protective devices. As many as three coils were included in one lift, causing the edges of the coils to cut into one another. In addition, some coils were dropped on other coils, and some were dropped onto the cement pier. Complaints were made about the way the coils were being discharged, but Pittston took no corrective action.

Demsey and Interstate sued in admiralty in the United States District Court for the Southern District of New York to recover damages against Sea Star (in rem), World Bulk, Atlantic and Pittston. Jordan was impleaded by Atlantic and World Bulk, and Jordan, in turn, filed cross-claims against World Bulk, Atlantic and Pittston. Atlantic and World Bulk, moreover, asserted cross-claims against each other and against Pittston. In an interlocutory order, reported at 321 F.Supp. 663 (S.D. NY.1970), Judge Bonsal held:

1. Plaintiffs are entitled to recover from World Bulk and Sea Star (in

rem) for all the damage to the coils, with the exception of normal atmospheric rust.

2. Interstate is entitled to recover from Pittston for the damage to the coils suffered during discharge in Chicago.

3. World Bulk is entitled to indemnity from Atlantic for any damages it must pay Demsey as a result of the harm suffered by the coils stowed in the 'tween deck.

4. Atlantic is entitled to indemnity from World Bulk for any damages it must pay either plaintiff as a result of the harm suffered by the coils stowed in the lower hold.

5. Atlantic and World Bulk are entitled to indemnity from Pittston to the extent Interstate recovers from either of them for harm done to the coils during discharge in Chicago.

6. Jordan has waived its right to have its dispute with World Bulk resolved by arbitration.

7. World Bulk is not entitled to indemnity from Jordan for damages it must pay either plaintiff as a result of improper loading and stowing in Tampico, and improper discharge in Chicago. World Bulk is entitled to indemnity from Jordan for any damages it must pay Interstate for the sixty-four coils which were excessively rusted and pitted.

8. Atlantic is not entitled to indemnity from Jordan to the extent plaintiffs recover in rem from Sea Star for damage caused by improper loading, stowing and discharge. Atlantic is entitled to indemnity from Jordan to the extent Interstate recovers in rem from Sea Star for excessive rusting and pitting to the sixty-four coils.

We shall discuss these findings seriatim.

1. Upon the issuance of bills of lading at Tampico, the loading, stowing, transport and discharge of the coils became subject to the Carriage of Goods by Sea Act of 1936 (COGSA), 46 U.S.C. Section 1300 et seq. (1970). COGSA Section 1305.

■ COGSA, Section 1301(a) defines "carrier" as "the owner or the charterer who enters into a contract of carriage with a shipper." According to Section 1301(b), a bill of lading is a contract of carriage. Because World Bulk's agent, Representaciones, signed the bills of lading, World Bulk is the COGSA carrier.

■ Under COGSA, plaintiffs established a prima facie case by proving receipt of the coils by the ship in good order, and delivery at destination in a damaged condition. Daido Line v. Thomas P. Gonzalez Corp., 299 F.2d 669 (9th Cir. 1962); Mamiye Bros. v. Barber Steamship Lines, Inc., 241 F.Supp. 99 (S.D.N.Y.1965), aff'd, 360 F.2d 774 (2d Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966); Interstate Steel Corp. v. S. S. "Crystal Gem," 317 F.Supp. 112 (S.D.N.Y.1970). COGSA, Section 1303(4) makes the bill of lading prima facie evidence of the receipt by the carrier of the goods as described in the bill.

Under Sections 1303(1) and (2) of COGSA, the carrier is bound to exercise due diligence to make the ship seaworthy, to make the ship fit and safe for the reception, carriage and preservation of the cargo, and to properly load, handle, stow and discharge the goods being shipped.

■ Every claim for cargo damage creates a maritime lien against the ship which may be enforced by a libel in rem. Gilmore & Black, The Law of Admiralty Section 3–45 at 165 (1957). COGSA, Section 1303(8) prohibits a shipowner from contracting out of this liability. The fact that the Sea Star was operated under charter to World Bulk does not affect the liability of the vessel. Pioneer Import Corp. v. The Lafcomo, 49 F.Supp. 559 (S.D.N.Y.), aff'd, 138 F.2d 907 (2d Cir. 1943), cert. denied sub nom. Black Diamond Lines,

Inc. v. Pioneer Import Corp., 321 U.S. 766, 64 S.Ct. 523, 88 L.Ed. 1063 (1944). The Sea Star became liable to the plaintiffs once the coils were aboard. Pioneer Import Corp., *supra*. Although the Master did not sign the bills of lading, the sailing of the Sea Star with the coils aboard constituted a ratification of the bills of lading. The Muskegon, 10 F.2d 817 (S.D.N.Y.1924); United Nations Children's Fund v. S/S Nordstern, 251 F.Supp. 833 (S.D.N.Y.1966). Because, however, Atlantic did not authorize World Bulk's agent to issue the bills of lading, Atlantic is not liable *in personam*. United Nations Children's Fund, *supra*; The Poznan, 276 F. 418 (S.D.N.Y.1921); Scrutton on Charterparties and Bills of Lading 51 (17th ed. 1964).

We therefore affirm the District Court's finding that a prima facie case has been made out against World Bulk and the Sea Star (in rem).

■ Once a prima facie case has been established, the burden of proof is on the defendants to establish that the damage was not due to their negligence, or that it was occasioned by one of the "excepted causes" in Section 1304(2) of COGSA. Daido Line v. Thomas P. Gonzalez Corp., *supra*, 299 F.2d 669 (9th Cir. 1962); Mamiye Bros. v. Barber Steamship Lines, Inc., *supra*, 241 F.Supp. 99 (S.D.N.Y.1965), aff'd, 360 F.2d 774 (2d Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966); American Tobacco Co. v. The Katingo Hadjipatera, 194 F.2d 449 (2d Cir. 1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952).

■ Judge Bonsal found that, with the exception of the rust, defendants failed to rebut plaintiffs' prima facie case. We hold that there was ample evidence to support this finding, and we affirm it. The hatch boards on the 'tween deck were old and dry, and therefore incapable of supporting the weight of the coils. Consequently, the Sea Star was to this extent unseaworthy with respect to carrying coils in the 'tween deck. Furthermore, as stated above, the coils were not properly and carefully stowed in the 'tween deck due to inadequate chocking and shoring and the stowage in the hold was in various respects improper. Finally, the discharge at Chicago was conducted in an improper manner. Accordingly, we agree with Judge Bonsal that, with the exception of the rust, defendants have not rebutted plaintiffs' prima facie case by demonstrating that the damage to the coils was not due to defendants' negligence. We therefore affirm the holding that Demsey and Interstate are entitled to recover from World Bulk and Sea Star (in rem) for all damage to the coils, with the exception of the rust.

■ ■ Interstate, however, also claims that it is entitled to recover for rust damage. We affirm the District Court's finding that the normal atmospheric rust found on all the Interstate coils was due to inherent vice, and that consequently, Interstate may not recover for this damage. Pan American Trade Development Corp. v. M/V Helga Howaldt, 257 F.Supp. 721 (S.D.Fla. 1966). Sixty-four of the Interstate coils, however, were excessively rusted and pitted. Judge Bonsal held, and we agree, that this excessive rust was not due to inherent vice. Copco Steel & Engineering Co. v. The Prins Willem Van Oranje, 159 F.Supp. 79 (E.D.Mich.1957); Copco Steel & Engineering Co. v. S/S Alwaki, 131 F.Supp. 332 (S.D.N.Y.1955); Copco Steel & Engineering Co. v. The Prins Frederik Hendrik, 129 F.Supp. 469 (E.D. Mich.1955). Whereas the sixty-four coils may have been excessively rusted and pitted at the time of loading, defendants are estopped from asserting this because Interstate had no knowledge of this condition, and clean bills of lading were issued. The Carso, 43 F.2d 736, 744 (S.D.N.Y.1930), aff'd in part and rev'd in part, 53 F.2d 374 (2d Cir. 1931); Copco Steel & Engineering Co. v. S/S Alwaki, *supra*, 131 F.Supp. 332, 334 (S. D.N.Y.1955); Levatino Company v. S. S. Norefjell, 231 F.Supp. 307, 318 (S.D. N.Y.1964). Accordingly, we affirm Judge Bonsal's holding that Interstate is entitled to recover from World Bulk and

Sea Star (in rem) for the excessive rusting and pitting of the sixty-four coils.

 2. Stevedores are liable for damage caused by their negligence. Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959); Luigi Serra, Inc. v. S. S. Francesco C., 1965 A.M.C. 2029 (S.D. N.Y.1965), aff'd, 379 F.2d 540 (2d Cir. 1967). The evidence is sufficient to establish negligent discharge by Pittston. Bare wire slings were used without protective devices. Testimony by witnesses to the discharge disclosed that coils were dumped onto the cement pier, and onto one another, and that there were as many as three coils in a sling at one time. Complaints were made about the manner of discharge, but to no avail.

Pittston contends, however, that any additional damage was unavoidable because of the damaged condition of the coils prior to discharge. Judge Bonsal held that Pittston should have notified Interstate of this fact before attempting to discharge the coils, citing United States v. The Bull Steamship Line, 274 F.2d 877 (2d Cir. 1960); O'Brien Bros. v. United States, 171 F.2d 586 (2d Cir. 1948); The Robert R., 255 F. 37 (2d Cir. 1918). Pittston maintains that this doctrine only applies in cases where the defect can be cleared up prior to discharge. See Judith Ann Liberian Transport Corp. v. Crawford, 399 F.2d 924 (9th Cir. 1968). We believe that it is unnecessary for us to pass on this point because Pittston has not shown how the pre-existing damage forced it to use bare wire slings, lift three coils in one sling, and drop the coils onto the cement pier and onto one another. Consequently, we affirm the holding below that Pittston is liable to Interstate for the additional damage to the coils caused by improper discharge.[1]

██ ██ 3 and 4. Under the terms of the time charter, Atlantic agreed to provide a vessel that was "tight, staunch, strong and in every way fitted for the service * * *." Consequently, Atlantic impliedly warranted to World Bulk that the Sea Star would be seaworthy for the transportation of the coils. Luckenbach v. W. J. McCahan Sugar Refining Co., 248 U.S. 139, 39 S. Ct. 53, 63 L.Ed. 170 (1918). The District Court found the Sea Star to be unseaworthy because the hatch boards of the 'tween deck were not capable of supporting the weight of the coils. We affirm this finding.

We do not, however, agree with the way in which the responsibility for the damage has been allocated. Judge Bonsal ruled that Atlantic was responsible for all of the damage to coils stowed in the 'tween deck, and that World Bulk was responsible for all of the damage to coils stowed in the lower hold. As we have seen, some of the damage in the lower hold was caused by one or more coils from the 'tween deck falling through the defective hatch boards onto the coils in the lower hold.

 World Bulk had the duty to load and stow the coils under the time charter. Luigi Serra, Inc. v. S. S. Francesco C., *supra*, 1965 A.M.C. 2029 (S.D.N.Y. 1965), aff'd, 379 F.2d 540 (2d Cir. 1967). The District Court found that World Bulk breached this duty. We affirm this finding. The evidence is clear that most of the damage was caused by the shifting and rolling of the coils in both the 'tween deck and in the hold during the voyage. This shifting and rolling, in turn, was a result of improper chocking, shoring and stowing.

---

1. Pittston also asserts that it was error not to admit its Exhibit F into evidence. This exhibit was an undated letter, addressed "to whom it may concern," describing the condition of the coils prior to discharge in Chicago. Pittston failed to demonstrate that the letter was a business record made in the regular course of business. *See* Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943). Furthermore, the deposition of the author of the letter was received in evidence at the trial and was given due consideration. We find no error in .this ruling.

This record contains no findings or other direct indication of how much of the total damage to the coils was due to improper stowage and how much was due to unseaworthiness, i. e., the falling of some coils through the defective hatch covers. We have already referred to this minor element of the damage to the coils. In any event, we reverse the holding below which distinguishes in bulk between the liability for damage to the coils in the 'tween deck and liability for damage to the coils in the hold, and we now decide and find that as between Atlantic and World Bulk responsibility for the damage caused by the shifting and rolling of the coils due to defective chocking, shoring and stowage in both the 'tween deck and in the hold rests upon World Bulk. Accordingly, we decide and find that to the extent that plaintiffs recover in rem from Sea Star, Atlantic is entitled to indemnity from World Bulk. This, of course, is subject to the ruling made on the remand concerning Atlantic's possible responsibility for the damage caused by unseaworthiness, i. e., the damage caused by one or more coils breaking through the defective hatch covers and falling into the hold below.

5. Pittston's warranty of workmanlike service ran in favor of World Bulk, Jordan, and Sea Star. Crumady v. The J. H. Fisser, 358 U.S. 423, 428, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). Pittston breached this warranty by discharging the coils in a negligent manner. Massa v. C. A. Venezuelan Navigacion, 332 F.2d 779 (2d Cir.), cert. denied, 379 U.S. 914, 85 S.Ct. 262, 13 L.Ed.2d 186 (1964). We therefore affirm the holding of the District Court that World Bulk and Atlantic are entitled to indemnity from Pittston to the extent Interstate recovers from them for damage caused by Pittston.

6. After participating in the entire litigation, Jordan contends that any dispute between it and World Bulk must now be resolved by arbitration because of the arbitration clause in the voyage charter.

World Bulk and Atlantic brought Jordan into this action as a third-party defendant under Rule 14 of the Federal Rules of Civil Procedure. Jordan pleaded arbitration as an affirmative defense. Although "arbitration and award" is an itemized affirmative defense under Rule 8(c), the mere existence of an arbitration clause is not such a bar. Jordan should have taken one of the steps available to it under the Rules. It could have moved for a stay of the action pending resolution by arbitration of its dispute with World Bulk. Pursuant to Rule 14 it could have moved for a severance of the third-party claim and for arbitration of the severed claim. Either course of action would have afforded Jordan protection of its rights in this lawsuit and would have preserved its claim that it was entitled to have certain issues tried by arbitration.

Instead, Jordan proceeded to file cross-claims against World Bulk, Atlantic and Pittston, participate fully in discovery, and go to trial on the merits. Whereas there is a strong federal policy favoring arbitration (see Coenen v. R. W. Pressprich & Co., 453 F.2d 1209, 1212 (2d Cir. 1972)), the right to arbitrate may be waived. Cornell & Company v. Barber & Ross Company, 123 U.S. App.D.C. 378, 360 F.2d 512 (1966).

Courts have allowed some participation in a lawsuit without finding waiver. Thus, in Carcich v. Rederi A/B Nordie, 389 F.2d 692 (2d Cir. 1968), the defendant participated in discovery and pre-trial conferences before moving for a stay. It was held the defendant had not waived its right to arbitrate. See also Robert Lawrence Company v. Devonshire Fabrics, Inc., 271 F.2d 402 (2d Cir. 1959), cert. granted, 362 U.S. 909, 80 S.Ct. 682, 4 L.Ed.2d 618, dismissed under Rule 60, 364 U.S. 801, 81 S.Ct. 27, 5 L.Ed.2d 37 (1960).

In Reynolds Jamaica Mines, Ltd. v. La Societe Navale Caennaise, 239 F.2d 689 (4th Cir. 1956), the defendant asserted a counterclaim. Before the plaintiff answered the counterclaim, the defendant, with leave of court, filed an amended

answer which specifically omitted the counterclaim, and asserted the arbitration clause as a separate defense. It was held that there was no waiver because the counterclaim was not answered. See also Chatham Shipping Co. v. Fertex Steamship Corp., 352 F.2d 291, 293 (2d Cir. 1965), where Judge Friendly said that "the earliest point at which such preclusion may be found is when the other party files an answer on the merits." Libellant had filed a libel, then changed its mind and asserted its right to arbitrate.

In Hilti, Inc. v. Oldach, 392 F.2d 368 (1st Cir. 1968), the defendant answered on the merits but included a special defense of arbitration, participated in discovery, and moved for summary judgment. Almost eight months later, defendant moved for a stay. It was held that there was no waiver. The court did say, however, that the result might have been different had defendant asserted a counterclaim. See also Mason v. Stevensville Golf and Country Club, Inc., 292 F. Supp. 348 (S.D.N.Y.1968).

Merely answering on the merits, asserting a counterclaim (or cross-claim) or participating in discovery, without more, will not necessarily constitute a waiver. We have found no cases, however, where arbitration has been allowed after a party has answered on the merits, asserted a cross-claim that was answered, participated in discovery, failed to move for a stay, and gone to trial on the merits.

Jordan contends that by asserting the arbitration clause as an affirmative defense, it was not taking action inconsistent with its right to arbitrate. The law is clear, however, that "[i]t is not 'inconsistency,' but the presence or absence of prejudice which is determinative of the issue." Carcich v. Rederi A/B Nordie, *supra*, 389 F.2d 692, 696 (2d Cir. 1968). See also Kulukundis Shipping Co., S/A v. Amtorg Trading Corp., 126 F.2d 978 (2d Cir. 1942). We can think of no clearer case of prejudice than we have here in this case. The substantial expense to all concerned that was involved in the trial of all the factual and legal issues in the case, including those raised by Jordan's cross-claims, was caused by Jordan's full participation in the pre-trial procedures and in the trial on the merits, despite its mere allegation of the arbitration clause in the voyage charter as a defense. We think it would be a gross miscarriage of justice now to require a retrial by arbitration of any of these issues.

Accordingly, we affirm the finding that Jordan has waived its right to arbitrate.

7. Under the voyage charter, Jordan was responsible for loading, stowing and discharging the coils. Judge Bonsal found that, consistent with this duty, Jordan paid for the stevedores in Tampico, Chicago and Cleveland. He held, however, that because Representaciones, World Bulk's agent, "coordinated" the loading and stowing in Tampico, and because World Bulk hired Pittston, World Bulk is not entitled to indemnification from Jordan. We disagree.

According to the record, Representaciones "coordinated" the Sea Star's activities in port and devised the stowage plan. This does not mean that Representaciones supervised the loading of the vessel. In fact the "coordination" is completely irrelevant to the issues in this case. We are satisfied that the loading and stowing of the Sea Star was done by stevedores under the supervision of the Master and the Chief Mate. We therefore reverse the District Court and hold that the "coordination" of the loading activities by Representaciones did not constitute such supervision as would relieve Jordan of its duties under the voyage charter.

Jordan contends, however, that Clause 17 of the voyage charter, which makes it Jordan's responsibility to load, stow and discharge, is void because it conflicts with World Bulk's statutory duty under COGSA. As we pointed out earlier, under Section 1303

(2) of COGSA, the carrier [2] has the duty to load, stow and discharge the cargo. Section 1303(8) voids any provision relieving the carrier of liability for failure to perform its duties under this Section. Jordan contends that Clause 17 of the voyage charter is just such an exculpatory provision. We disagree. Section 1303(2) made it World Bulk's duty to the plaintiffs to load, stow and discharge the cargo. The fact that Jordan owes this same duty to World Bulk, under the voyage charter, in no way affects World Bulk's responsibility to Demsey and Interstate.[3] Consequently, we hold that World Bulk is entitled to indemnity from Jordan to the extent plaintiffs or Atlantic recover from World Bulk for damage that was caused by improper loading and stowing.

We also disagree with the ruling below that World Bulk is not entitled to indemnification from Jordan for any damages it must pay Interstate as a result of Pittston's negligence. This ruling was based on a finding that World Bulk hired Pittston. Judge Bonsal held, however, that it was Jordan's duty to discharge the cargo and that Jordan had, in fact, paid for Pittston's services. In light of these facts we decide and find that Jordan, not World Bulk, was Pittston's employer. Accordingly, World Bulk is entitled to be indemnified by Jordan to the extent it must pay Interstate for damage that occurred during discharge in Chicago.

We affirm the lower court holding that, because of the letter of indemnity written by Jordan, World Bulk is entitled to indemnification from Jordan for excessive rust damage to sixty-four of the Interstate coils.

8. Judge Bonsal held that Atlantic was not entitled to indemnity from Jordan because Representaciones "coordinated" the loading of the Sea Star and because World Bulk hired Pittston. As we have seen, the "coordination" by Representaciones did not relieve Jordan of its responsibilities under the voyage charter. Atlantic, however, was a stranger to the voyage charter. There is no privity between Atlantic and Jordan. The Banes, 221 F. 416 (2d Cir. 1915); Flat-Top Fuel Co. v. Martin, 85 F.2d 39 (2d Cir. 1936).

But, in a proceeding of this character, we see no point in an elaborate and wholly unnecessary circuity of action. As Atlantic is entitled to indemnity from World Bulk for the damage caused by improper loading and stowing and as World Bulk is entitled to indemnity for the same damage from Jordan, the result is that Jordan must pay the principal amount of loss for cargo damage involved in this case. By parity of reasoning if Atlantic is liable for the damage caused by Pittston's negligence in the unloading at Chicago and is entitled to indemnity from Pittston or from Jordan, Pittston's employer, this loss must be paid by Pittston.

We affirm the ruling below that Atlantic is entitled to be indemnified by Jordan to the extent Interstate recovers, in rem, from Sea Star for the excessive rust damage to the sixty-four coils.[4]

Thus we have disposed of the legal questions affecting liability as between

---

2. World Bulk contends that because the bills of lading were signed in connection with the voyage charter, at Jordan's request, Jordan was the COGSA carrier. We disagree. The bills of lading were issued in return for the letter of indemnity by Jordan already referred to. We are of the view that Jordan induced World Bulk prematurely to issue the bills by offering indemnity in return. Under COGSA, Sections 1301(a) and (b), a charterer who issues bills of lading is the carrier.

3. World Bulk, of course, also had the duty to load and stow under the time charter. This duty runs in favor of Atlantic and in no way affects World Bulk's rights and duties under either the voyage charter or under COGSA.

4. The ruling below was apparently based on the assumption that the Sea Star was intended to be a beneficiary of Jordan's letter of indemnity to World Bulk. As Jordan does not appeal from this interpretation of the letter, we let it stand.

the parties to this litigation. There remains a congeries of factual issues which Judge Bonsal made no attempt to resolve as this would normally be the task of a Commissioner or Master who has not yet been named. For example:

(1) Most of the damage to the steel coils was caused by the failure to shore and chock coils in the 'tween deck and the failure properly to stow the coils in the hold. Because of this negligence many coils rolled around the 'tween deck and others in the hold hit against one another. There must be a factual determination in terms of dollars of the total amount of the damage caused by failure to properly load and properly stow the cargo.

(2) The damage caused by Pittston in the unloading at Chicago must be fixed in terms of dollars *vis-a-vis* the total damage, most of which was caused during the voyage from Tampico.

(3) There must be a determination in terms of dollars of the damage to the sixty-four Interstate coils found to be excessively rusted and pitted.

In view of the unusual expenditure of time and effort by counsel and by the District Court and by this Court in attempting to unravel the maze of conflicting contentions in this complicated case and the relatively small amount of money involved, we think it proper to repeat Judge Bonsal's excellent suggestion that the amounts due to Demsey and Interstate and the amounts to be paid by Jordan for the overall damage and for excessive rust and pitting of the sixty-four coils and by Pittston for the damage caused by the unloading at Chicago, be stipulated.

Affirmed in part and reversed in part. The case is remanded to the District Court for further proceedings not inconsistent with this opinion.