**ASBESTOS CORP. LTD., et al.,**
Plaintiffs,

v.

**COMPAGNIE DE NAVIGATION FRAIS-SINET ET CYPRIEN FABRE et al.,**
Defendants.

**No. 65 AD 785.**

United States District Court,
S. D. New York.

June 15, 1972.

Bigham, Englar, Jones & Houston, New York City, for plaintiffs; James H. Simonson, John T. Kockendorfer, Thomas J. Hanrahan, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for defendants; Edward L. Smith, Enrico S. Sanfelippo, New York City, of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW.

LEVET, District Judge.

Plaintiff, Asbestos Corp. Ltd., and other shippers, plaintiffs in this action, seek to recover for cargo damage as a result of fire aboard the M/V Marquette, owned by defendant Compagnie De Navigation Fraissinet et Cyprien Fabre, while transversing the North Atlantic Ocean en route from Great Lakes ports to European ports.

The initial issue on liability here is whether the defendant[1] exercised due diligence before and at the beginning of the voyage to make the ship seaworthy so that the vessel was properly equipped and possessed adequate fire fighting equipment to fight an engine room fire. It is the contention of the defendant that it is exempt from liability under the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(2) (b) and the Fire Statute, 46 U.S.C. § 182.

After hearing the testimony of the parties, examining the exhibits, pleadings and Proposed Findings of Fact and Conclusions of Law and post-trial memoranda submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. The rights of the parties are governed by the Carriage of Goods by

---

1. In this opinion "defendant" refers to all defendant-shipowners.

Sea Act (COGSA), 46 U.S.C. § 1300 et seq. and the Fire Statute, 46 U.S.C. § 182. The provisions of the Safety of Life at Sea Convention (1929 or 1948) (SOLAS) do not control the rights of the parties herein. Compliance with SOLAS is insufficient to render the Marquette seaworthy. Compliance with SOLAS does not exempt the defendant from liability under COGSA § 1304(2) (b) or the Fire Statute.

2. Plaintiffs were holders of bills of lading for cargo shipped in apparent good order and condition aboard the Marquette at Great Lakes ports for transportation to European ports. (4, 50–51, 224–225, Ex. L.) [2] The bills of lading provide that the rights of the parties are subject to the terms of COGSA and the Fire Statute. (Ex. 1.)

The bills of lading provide:

"It is agreed that the custody and carriage of the goods are subject to the following terms which shall govern the relations whatsoever they may be, between the shipper . . . and the Carrier . . . in every contingency, wheresoever and whensoever occurring, and also in the event of deviation or of unseaworthiness of the ship at the time of loading or inception of the voyage or subsequently, and none of the terms of this bill of lading shall be deemed to have been waived by the carrier unless by express waiver in writing and signed by a duly authorized agent of the carrier:

"1. This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States . . . which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. The provisions stated in said Act shall govern . . . throughout the entire time the goods are in the custody of the Carrier.

\* \* \* \* \* \*

"16. Neither the carrier nor any corporation owned by, subsidiary to or associated or affiliated with the carrier shall be liable to answer for or make good any loss or damage to the goods occurring at any time and even though before loading on or after discharge from the ship, by reason or by means of any fire whatsoever, unless such fire shall be caused by its design or neglect."

3. The Marquette is a vessel of French registry owned and operated by the defendant. She was launched on October 4, 1952 and delivered to her owners fully outfitted on April 4, 1953. She was lengthened or "jumboized" during the period from January 15 to March 2, 1959. (6, 13, 44, 117, Exs. A, L.)

4. On July 21, 1964, at approximately 11:15 A.M., while transversing the North Atlantic Ocean, fire broke out in the engine room of the Marquette when a defective screw fell from an oil pump, causing oil to spray onto and become ignited by the manifold of an adjacent propulsion engine. (4, 15–18, 52, 59, 73, Exs. 1 and 2A.)

5. The fire spread slowly from the engine room into the living quarters of the bridge and the radio operator's room, then into the No. 4 cargo hold where the fire was observed six hours after the outbreak of the fire in the engine room, then into the No. 5 cargo hold and finally into the No. 2 and No. 3 cargo holds. (4–5, 83.)

The S. S. Pentillian came to the assistance of the Marquette and towed her to Brest, France, arriving July 29th. The fire which continued to burn was extinguished at Brest and so much of the cargo as was not totally destroyed was discharged under the supervision of a cargo surveyor appointed by the Commercial Court of Brest. (4–7, Exs. 3A, N.)

2. Unless otherwise indicated, numbers in parentheses refer to pages in the stenographer's minutes of the trial.

6. The Marquette was equipped with ten pumps for all purposes. (61.) Of these ten pumps the Marquette had one fire pump, one bilge pump and one ballast pump; all of which could be used for fighting fires. (16, 60–66, 106.) All pumps are located in the engine room. (61–62.) All pumps are controlled from the engine room and to operate such pumps it is necessary to enter the engine room. (57, 61–62.) The Marquette was also equipped with one stationary foam extinguisher, five portable extinguishers (three containing $CO_2$ and two containing foam) and two boxes of sand for fighting fires. All of this fire fighting equipment was located in the engine room. (75–76, 112.) The crew of the Marquette could not fight the fire as the fire pumps had become inaccessible by reason of the fire and there were no controls external to the engine foom for starting the fire pumps. (9, 16, 57–58, 149, 197–198.) Furthermore, no emergency fire pump or fire fighting system had been provided outside the engine room in the event fire should make inaccessible the fire pumps located in the engine room. (16, 61–62, 196–197.)

7. The Marquette further maintained a steam smothering system for fighting fires. This system had outlets in the engine room. Two valves opening and closing the outlets were also located in the engine room. It takes an able seaman about forty-five seconds to open these two valves. When the steam smothering system is operating properly steam is forced through the outlets to smother any fire in the engine room. However, this system could not be used to fight the fire because the valves were never opened to made the system operational. The valves were closed when the fire broke out and could not be opened because of the fire. A steam smothering system with valves for opening the engine room outlets located in the engine room is not an adequate fire fight-

ing system. (12, 16–17, 63, 75–88, 115–118, 228, 237.)

8. About ten minutes elapsed after the loss of the screw and the start of the fire. (87–88.) The mere outbreak of the fire did not force the immediate evacuation of the engine room. For several minutes thereafter the four crew members on watch in the engine room remained, shutting off vital components. (88, Exs. V. Z.) The chief engineer went down to the engine room through an escape tunnel to see if any crew members were still in the engine room. (56, 74, 113, 119.) From the escape tunnel the chief engineer ascertained that it was impossible to enter the engine room and open the valves for the steam smothering system because of the fire. (78, 113, 119.) After remaining in the escape tunnel for ten to fifteen minutes the chief engineer returned to the bridge. (77–78, 198.) On the bridge, the chief engineer informed the ship's captain that it was impossible to fight the fire.[3] Thereafter, in a last attempt to fight the fire, by cutting off its oxygen supply, a tarpaulin was placed over the top of an air funnel leading into the engine room. This maneuver was unsuccessful for the tarpaulin quickly caught fire. (78–79.)

9. Engine room fires are dangerous and likely to spread rapidly by reason of the presence within that compartment of large quantities of oil and numerous hot surfaces of sufficiently high temperature to ignite oil coming into contact with them. However, engine room fires can be successfully extinguished if they are quickly attacked. (159–162.) Putting all fire fighting equipment inside the engine room without external controls is inadequate fire protection (155, 159.) A ship may maintain an alternative means for fighting fires such as a steam smothering system but the system aboard the Marquette was inadequate for fighting the fire because the valves

---

3. By deposition Chief Engineer Willieme testified, "I talked with the captain and at this moment in my opinion the ship was condemned as we had no further possibility of fighting the fire." (78.)

for opening the outlets leading into the engine room were located inside the engine room. (156.) An emergency fire pump, either water, $CO_2$, foam, or one of like character, located outside the engine room could have been used to fight the fire. In like manner, an emergency fire system with controls located outside the engine room could have been used to fight the fire. (173–176, 184–188, 196–198.) The fire could have easily been fought from the emergency tunnel leading into the engine room by using a water hose with a spray nozzle. (149, 162.) It is reasonably certain that any one of these methods could have extinguished the engine room fire aboard the Marquette.

10. In summary I find that:

1. COGSA and the Fire Statute govern the rights of the parties.

2. The Marquette maintained a steam smothering system for fighting fires. However, this system could not be used to fight the engine room fire because the valves regulating the system were located in the engine room and could not be opened because of the fire.

3. All equipment aboard the Marquette available for fighting the engine room fire was located in or controlled from the engine room. The fire in the engine room made it impossible to use this equipment. The Marquette maintained no emergency fire pump or fire fighting system outside the engine room to combat the fire which broke out in the engine room. If the Marquette had maintained such a system it is likely that the engine room fire could have been extinguished.

■■ 11. Based upon the foregoing findings I find and conclude that the Marquette was unseaworthy and the de-

fendant is not exempt from liability under COGSA § 1304(2) (b) or the Fire Statute.

## DISCUSSION

The rights of the parties are governed by the Carriage of Goods by Sea Act, 46 U.S.C. § 1300 et seq. and the Fire Statute, 46 U.S.C. § 182.

It is the contention of the respondent-carrier that the Safety of Life at Sea Convention (1929 or 1948) (SOLAS) is applicable in determining the rights of the parties. This court disagrees.

■■ A bill of lading is a contract of carriage. COGSA § 1301(b), Pollard v. Vinton, 105 U.S. 7, 8, 26 L.Ed. 998 (1881); Demsey & Associates, Inc. et al. v. S. S. Sea Star, 461 F.2d 1009 (2d Cir. 1972). The parties entered into a valid contract of carriage, the provisions of which are controlling. The bills of lading in question here specifically provide that the rights of the parties are subject to the terms of COGSA and the Fire Statute. In any event, compliance with SOLAS does not render the Marquette seaworthy or exempt the defendant-shipowners from liability under COGSA § 1304(2) (b) or the Fire Statute.

■ This case arises from a fire which broke out on the French registered vessel M/V Marquette on July 21, 1964 in the North Atlantic Ocean, while on voyage from Great Lakes ports to European ports. It is the contention of the plaintiffs that the fire was caused by the unseaworthy condition of the Marquette. In answer to the libel the respondent-shipowners raise several affirmative defenses including the defense of due diligence[4] as well as a defense based on the Fire Statute[5] and the ex-

---

4. Under Section 3(1) of COGSA (49 Stat. 1208 (1936), 46 U.S.C. § 1303(1) (1958) it is the duty of a carrier "to exercise due diligence to—make the ship seaworthy . . . ." Section 4(1) states that "Whenever loss or damage has resulted from unseaworthiness, the burden of prov-

ing the exercise of due diligence shall be on the carrier . . . ."

5. Rev.Stat. § 4282 (1875), 46 U.S.C. § 182 (1958):
"No owner of any vessel shall be liable to answer for or make good to any per-

ception for fire in Section 4(2) (b) of COGSA.[6] The shipowner has the burden of proof with respect to each of these affirmative defenses.[7] The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65 (1903); Federazione Italiana v. Mandask Compania de Vapores, S.A., 342 F. 2d 215 (2d Cir. 1965); M. W. Zack Metal Co. v. S. S. Birmingham City, 311 F. 2d 334, 337 (2d Cir. 1962), cert. denied, 375 U.S. 816, 84 S.Ct. 50, 11 L.Ed.2d 51 (1963) and cases cited, Gilmore and Black, The Law of Admiralty 162–163 (1957).

■ Under COGSA, plaintiffs established a prima facie case by proving receipt of the cargo by the Marquette in good order, and delivery at destination in a damaged condition. J. Gerber & Company v. S. S. Sabine Howaldt, 437 F.2d 580 (2d Cir. 1971); Daido Line v. Thomas P. Gonzalez Corp., 299 F.2d 669 (9th Cir. 1962); Mamiye Bros. v. Barber Steamship Lines, Inc., 241 F.Supp. 99 (S.D.N.Y.1965), aff'd, 360 F.2d 774 (2d Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966); Interstate Steel Corp. v. S. S. "Crystal Gem," 317 F.Supp. 112 (S.D.N.Y.1970). COGSA, Section 1303(4), makes the bill of lading prima facie evidence of the receipt by the carrier of the goods as described in the bill.

Under Sections 1303(1) and (2) of COGSA, the carrier is bound to exercise due diligence to make the ship seaworthy, to make the ship fit and safe for the reception, carriage and preservation of the cargo. Demsey, supra.

■ Once a prima facie case has been established, the burden of proof is on the defendant to establish that the damage was not due to its negligence, or

that it was occasioned by one of the excepted causes. Director General of India Supply Mission for and on Behalf of President of Union of India v. S. S. Maru, 459 F.2d 1370 (2d Cir. 1972); Demsey & Associates, Inc. et al. v. S. S. Sea Star, supra; Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426 (2d Cir. 1963); Daido Line v. Thomas P. Gonzalez Corp., supra; American Tobacco Co. v. The Katingo Hadjipatera, 194 F.2d 449 (2d Cir. 1951), cert. denied, 343 U. S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952); Mamiye Bros. v. Barber Steamship Lines, Inc., supra.

As Judge Learned Hand observed in Metropolitan Coal Co. v. Howard, 155 F.2d 780, 783–784 (2d Cir. 1946), "the warranty of seaworthiness is a favorite of the admiralty and exceptions to it or limitations upon it, are narrowly scrutinized."

■ The Fire Statute provides that the vessel owner is not liable to the shipper for losses caused by fire on board unless such fire is caused by the "design or neglect of such owner." It is established law that "the design or neglect" through which the owner loses this exemption must be personal to the owner. Negligence on the part of the master, any crew member or agent is not imputed to the owner. However, courts have found that fault of managing agents to whom the corporation delegates the task of inspection, decisions on precautions and the like is the fault of the owner. Consumers Import Co. v. Kabushiki Kaisha, 320 U.S. 249, 252, 64 S.Ct. 15, 88 L.Ed. 30 (1943); Arkell & Douglas, Inc. v. United States, 13 F.2d 555 (2d Cir. 1926); The Edmund Fanning, 105 F.Supp. 353, 359 (S.D.N.Y.1952).

---

son any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."

6. 49 Stat. 1210 (1936), 46 U.S.C. § 1304 (2) (b) (1958):

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

\* \* \* \* \*

"(b) Fire, unless caused by the actual fault or privity of the carrier . . . ."

7. As hereinbefore stated the defense that the Marquette complied with SOLAS or the regulations of the French government does not render the ship seaworthy.

■ COGSA exempts the carrier from liability due to fire "unless caused by the actual fault or privity of the carrier." "Actual fault or privity" under COGSA and "design or neglect" under the Fire Statute have the same meaning. Great Atlantic & Pac. Tea Co. v. Lloyd Brasileiro, 159 F.2d 661, 664 (2d Cir. 1947); The Doris Kellogg, 18 F.Supp. 159 (S.D.N.Y.1937), aff'd, In re Kellogg S. S. Corp., 94 F.2d 1015 (2d Cir. 1938); The Edmund Fanning, 105 F. Supp. 353, 371, aff'd, 201 F.2d 281 (2d Cir. 1953). Vessels of foreign registry as well as vessels of domestic registry come within the Fire Statute exonerating vessel owners from liability unless the fire is caused by the "design or neglect" of the owner. Fidelity-Phenix Fire Ins. Co. of N. Y. v. Flota Mercante Del Estado, 205 F.2d 886 (5th Cir. 1950). Unseaworthiness does not prevent the application of the Fire Statute. Earle & Stoddart, Inc. v. Ellerman's Wilson Line, Ltd., 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403 (1932); Hoskyn & Co. v. Silver Line, 143 F.2d 462 (2d Cir. 1944).

■ Once the defendant has sustained the burden of proving that it comes within the exemption of COGSA § 1304(2)(b) or the Fire Statute the burden then shifts to the shipper to prove that the fire was caused by the "design or neglect" or "actual fault or privity" of the carrier. J. Gerber & Co. v. S. S. Sabine Howaldt, 437 F.2d 580, 588 (2d Cir. 1971); Lekas & Drivas, Inc. v. Goulandris, 306 F.2d 426, 431–432 (2d Cir. 1962); Automobile Insurance Co. v. United Fruit Co., 224 F.2d 72 (2d Cir. 1955); Consumers Import Co. v. Kabushiki Kaisha, 133 F.2d 781 (2d Cir.), aff'd, 320 U.S. 249, 64 S.Ct. 15, 88 L.Ed. 30 (1943); Earle & Stoddart Inc. v. Ellerman's Wilson Line, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403 (1932); American Tobacco Co. v. Goulandris, 173 F. Supp. 140, 178–179 (S.D.N.Y.1959), aff'd, 281 F.2d 179 (2d Cir. 1959).

■ It is well established in Admiralty that a carrier must use reasonable precaution to protect cargo from any type of damage. The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L.Ed. 65 (1903); The Maria, 91 F.2d 819, 823 (4th Cir. 1937); Henson v. Fidelity & Columbia Trust Co., 68 F.2d 144, 145 (6th Cir. 1933); Trexler v. Tug Raven, 290 F. Supp. 429, 442 (E.D.Va.1968) (American Mutual).

The plain issue before this court is whether or not the Marquette was seaworthy in that she was properly equipped to fight an engine room fire. Whether or not the owners of the Marquette used the required high degree of care in providing adequate fire fighting equipment must be determined from the evidence adduced.

In The Virginia, 264 F. 986, 996 (D. C.Md.1920), a case not dissimilar to the one before this court, the vessel was engaged in carrying passengers and cargo between Baltimore and Norfolk. As the result of fire on one of her voyages, most of her cargo was destroyed. The vessel owner claimed exemption under the Fire Statute. The district court stated:

"The Virginia went down to Norfolk one night and came back to Baltimore the next. It was never more than a few hours away from the actual observation of the executive officers of its owner. . . . Most certainly, they made no attempt to have the sprinkler system kept useful. It follows that there was neglect in the petitioners themselves. . . . But for such negligence, the fire might have been extinguished before the cargo was destroyed. Consequently, section 4282 [Fire Statute] does not protect the petitioners against the claims of the owners of the lost merchandise."

The Court of Appeals, 278 F. 877, 880 (4th Cir. 1921), affirming the district court, said:

"It is evidence, from the facts found by the court below, that there was such an entire absence of due prepar-

edness and precautions, with apparatus ready to be put into use to meet contingencies of fire, as well as such a total breakdown of discipline at the critical moment, as to show that they were the inevitable and natural results of conditions which had long existed, and which it was the duty of the owner of the vessel to take proper measures to provide against. It equally follows, from the testimony and the findings of the learned judge below, that the failure to take such necessary and proper precautions to ascertain the existence of what was necessary in common prudence to protect from such a casualty, and to see that provision was made against it, was negligence on the part of the owner, and that, that being the case, the petitioner is not entitled to exemption from liability as provided under the terms of section 4282 [Fire Statute]."

The Rio Gualeguay, 205 F.2d 886 (5th Cir. 1953). See also Christopher v. Grueby, 40 F.2d 8 (1st Cir. 1930).

Engine room fires are dangerous and likely to spread rapidly by reason of the presence within that compartment of large quantities of oil and numerous hot surfaces of sufficiently high temperatures to ignite oil coming into contact with them. However, engine room fires can be fought successfully if the proper equipment is at hand. Very often a simple water hose with a spray nozzle can extinguish an engine room fire quickly and thereby prevent a holocaust.[8] (162.)

The fire was confined to the engine room of the *Marquette* for some six hours before it spread to the cargo hulls. The crew in the engine room were not forced to immediately evacuate the engine room upon the first outbreak of fire. After the fire had forced the evacuation of the engine room the chief engineer was able to enter the engine room through an escape tunnel and remain there for ten minutes. It is reasonable to conclude from the documented facts that the crew of the Marquette could have fought the engine room fire after its initial outbreak. The emergency tunnel leading into the engine room was an ideal position from where to fight the fire. From this position a person fighting the fire is below the torrid heat wave in the engine room and at the same time there is a cool breeze blowing through the tunnel. (149–152.) It is reasonable to conclude that the engine room fire could have been successfully fought from this position. Furthermore, if the Marquette had employed an emergency fire pump or fire fighting system outside the engine room which could have been deployed to fight a fire inside the engine room, it is likely that the fire could have been extinguished. (173–174, 186, 197–198.)

The use of emergency fire pumps or $CO_2$ or foam systems with controls located outside the engine room is a practice which is not uncommon in the maritime industry. (173–175, 189.) Minimal expense and effort is incurred in installing any one of such systems. It would have been convenient for the owners of the Marquette to install such equipment when she was outfitted in 1952 and especially when she was "jumboized" in 1957. In any event, such a system could have been installed at any time in a matter of hours. (185–188.)

 It is true that the Marquette maintained a steam smothering system for fighting shipboard fires. However, such a system as it existed at the time of the fire was useless and provided no protection against engine room fires. (159.) Even if the steam smoth-

8. Plaintiffs' expert on shipboard fires, Frank Rushbrook, a Scotsman, who has received from the Queen the Insignia of the Commander of the Order of the British Empire for his service in combating shipboard fires, strongly propounds an enunciation by Shakespeare, "A little fire is quickly trodden out, Which being suffered, rivers cannot quench." King Henry VI, Part 3, Act IV, Scene VII. (163, Ex. 8.)

ering was fully operational it is uncertain as to whether or not it could have successfully extinguished the fire. (191–194.) The fact that the steam smothering system could not be made operational because it was impossible to open the valves in the engine room is enough to preclude the respondent from evoking the Fire Statute or COGSA § 1304(2) (b). Hines v. Butler, 278 F. 877 (4th Cir. 1921).

It is indeed unfortunate that all equipment aboard the Marquette available for fighting engine room fires was located in or controlled from the engine room. It was this "putting all the eggs in one basket" (158) which led to the deplorable situation to which the chief engineer testified: "the ship was condemned as we had no further possibility of fighting the fire."

It is incumbent upon every shipowner to provide a seaworthy vessel, equipped with adequate means of fighting fire on board. The standard is whether it is reasonable for a shipowner to provide certain apparatus to meet the contingency of fire. Hines v. Butler, supra, Christopher v. Grueby, supra. What is reasonable is what is required in light of all the circumstances. This court has no interest in imposing an unreasonable or higher standard than required upon the shipowner. Minimal foresight, however, dictates that the engine room is highly volatile compartment of a ship and the possibility of fire breaking out is ever present. A shipowner must anticipate and provide for the contingency that a fire may break out in the engine room disabling all fire fighting equipment located in the engine room. The owners of the Marquette through their "design or neglect" and "privity or knowledge" were negligent in placing all fire fighting equipment inside the engine room and failing to provide an emergency pump or fire system located or controlled from outside the engine room. This negligence on the part of the shipowners displays a total disregard for minimal protection of cargo and rendered the Marquette unseaworthy. Under the circumstances this court concludes that the defendant-shipowners are not exempt from liability under COGSA § 1304(2) (b) or the Fire Statute.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and of the subject matter of this action under Article 3, Section 2 of the Constitution of the United States and under Title 28 U.S.C. Section 1331(1).

2. The rights of the parties are governed by the Carriage of Goods by Sea Act, Title 46 U.S.C. Section 1300 et seq. and the Fire Statute, Title 46 U.S.C. Section 182.

3. The M/V Marquette was unseaworthy in that the defendant shipowners failed to exercise due diligence in equipping the Marquette with adequate means for fighting an engine room fire.

4. The fire aboard the Marquette which destroyed the plaintiffs' cargo was due to the "design or neglect" and "privity or knowledge" of the defendant-shipowners and therefore the said shipowners are not exempt from liability under COGSA § 1304(2) (b) or the Fire Statute.

The plaintiffs and defendant are entitled to an interlocutory judgment which shall provide for determination by a special master the damages to which plaintiffs may be entitled.