**AXA VERSICHERUNG AG, on its own behalf and as successor in interest to Albingia Versicherungs AG, Plaintiff,**

v.

**NEW HAMPSHIRE INSURANCE COMPANY; American Home Assurance Company; and National Union Fire Insurance Company of Pittsburgh, Pennsylvania, Defendants.**

**No. 05 Civ. 10180(JSR).**

United States District Court, S.D. New York.

April 29, 2010.

cessor in interest to Albingia Versicherungs AG ("Albingia"), against three subsidiaries of American International Group: namely, defendants New Hampshire Insurance Company, American Home Assurance Company, and National Union Fire Insurance Company of Pittsburgh, Pennsylvania (collectively, "AIG"). After the case was reassigned to this judge from Chief Judge Mukasey, the case proceeded to trial, and a jury rendered a verdict in AXA's favor, holding AIG liable in the amount of $34,373,170, including $5,750,000 in punitive damages, for fraudulently inducing Albingia to enter into two reinsurance facilities. Final judgment was entered on February 6, 2008.

AIG then appealed, and the Second Circuit, by Summary Order dated October 6, 2009, remanded the case to this Court for further proceedings in order to develop the factual record and make certain findings in relation to whether the claims brought by AXA should have been sent to arbitration. *AXA v. AIG*, 348 Fed.Appx. 628, 630–31 (2d Cir.2009). Although Chief Judge Mukasey had stayed AIG's attempt to take the matter to arbitration, the Second Circuit noted that the basis for his stay was "not entirely clear," *id.* at 630, and thus this Court's subsequent conclusion that the issue of arbitration had effectively been decided adversely to AIG by Judge Mukasey "did not clearly address the parties' arguments," *id.* Accordingly, the Second Circuit directed this Court (1) with respect to the question of whether AXA's claims were subject to certain contractual arbitration clauses, to "address in the first instance the extent to which AXA's allegations [that comprise the fraudulent inducement claim that went to trial] sound in contract as opposed to fraud"; and (2) to create a record and resolve in the first instance the issue of

Joseph P. Cyr, Sean Thomas Keely, Lovells, LLP, New York, NY, Paul Bradford Ockene, Joseph T. McCullough, IV, Robin C. Dusek, Lovells, Chicago, IL, for Plaintiff.

Stuart Edmund Cotton, David William Kenna, Mound Cotton Wollan & Greengrass, David Lawrence Elsberg, Kathleen M. Sullivan, Michael Barry Carlinsky, William Balden Adams, Quinn Emanuel Urquhart Oliver & Hedges LLP, New York, NY, for Defendants.

## FINDINGS AND CONCLUSIONS

JED S. RAKOFF, District Judge.

This lawsuit was brought by plaintiff AXA Versicherung AG ("AXA"), the suc-

whether AIG waived its right to arbitration. *Id.* at 630–31. Following remand, the Court received written submissions from the parties with respect to these issues and held oral argument on December 8, 2009. For the following reasons, the Court finds, first, that AXA's fraudulent inducement claim sounds in fraud and, in any event, falls outside the relevant arbitration clauses, and second, that even if the claim were arbitrable, AIG through its litigation conduct waived any right to arbitration.

■ The Court turns first to the arbitrability of AXA's fraudulent inducement claim. By way of background, in late 1996, AIG, acting through brokers, solicited Albingia's participation in a reinsurance facility that was intended to cover a "primary layer" of $10 million (*i.e.*, the first $10 million of loss) with respect to certain energy risks in the South Pacific Rim region that were insured by AIG for the period between November 1, 1996 through December 31, 1997 (the "1997 Facility"). On January 10, 1997, one of AIG's brokers sent Albingia a proposed "slip" setting forth the basic elements of the agreement, to which Albingia agreed shortly thereafter. Decl. of Sean Thomas Keely, 11/6/09 ("Keely Decl."), Ex. 16 (Trial Ex. 40). (In accordance with industry practice, a "slip" sets forth the basic terms of the agreement, which thereafter may be supplemented by "endorsements," and which in some circumstances may be supplemented by more formal "wordings." *See* AIG Letter Brief, 11/6/09 ("11/6/09 AIG Letter"), at 1–2.) In December 1997, Albingia agreed to a slip that renewed the participation in the facility for the period between December 1, 1997 and December 31, 1998, increased the extent of partic-

ipation from 20% to 25%, and expanded the risks covered by the facility to include energy risks beyond those in the South Pacific Rim (the "1998 Facility"). *Id.* Ex. 20 (Trial Ex. 128). This slip, unlike the 1997 slip, was supplemented by "wordings" executed in August 1998. Decl. of William B. Adams, 11/6/09 ("Adams Decl."), Ex. J (Trial Ex. 217).

Each of the Facilities contained an arbitration clause providing in relevant part as follows:

> All disputes or differences arising out of the interpretation of this Agreement shall be submitted to the decision of two arbitrators, one to be chosen by each party. . . .

*Id.* Exs. H & J (Trial Exs. 343 & 217). After AXA, alleging, *inter alia*, fraudulent inducement, ceased paying amounts allegedly due from it under the Facilities, AIG, on November 17, 2005, demanded arbitration to recover the unpaid amounts. Decl. of Stuart Cotton, 11/5/09 ("Cotton Decl."), Ex. A. AXA responded, on December 2, 2005, by filing the instant lawsuit. As subsequently modified in two amended complaints, AXA alleged, *inter alia*, that AIG fraudulently induced its agreement to the Facilities through both affirmative misrepresentations and material nondisclosures.[1]

AIG's essential argument is that at least some of AXA's allegations of misrepresentation and nondisclosure that comprised the fraudulent inducement claim submitted to the jury "sound in contract" and therefore should have been arbitrated as "disputes or differences arising out of the interpretation" of one or both of the Facil-

---

1. Although pleaded as two separate claims, these claims were, on consent, merged into a single claim of fraudulent inducement for purposes of presentation to the jury. Trial Transcript ("Tr.") at 1735.

ities.[2] These allegations, according to AIG, are essentially of three kinds. The first are to the effect that "AIG and/or its agents promised Albingia that the Facilities would be facultative obligatory but treated them as purely facultative in fact" (the "Facultative Obligatory Allegations"). 11/6/09 AIG Letter at 2. The second are to the effect that "AIG used the Facilities to offload inferior and unprofitable business instead of ceding a cross-section of risks" (the "Adverse Selection Allegations"). *Id.* at 2–3. The third are to the effect that "AIG and/or its agents increased Albingia's share of each risk under the Facilities beyond Albingia's understanding" (the "Risk Allocation Allegations").[3] *Id.* at 3. To understand these allegations more fully, some further explication is required.

*(1) The Facultative Obligatory Allegations.* These allegations turn on the distinction between "facultative" and "facultative obligatory" reinsurance contracts. Facultative reinsurance contracts give the primary insurer discretion to propose which risks to "cede," or transfer, to the reinsurer, but give the reinsurer discretion to accept or decline each such risk as it sees fit. Facultative obligatory reinsurance contracts, by contrast, permit the primary insurer to select which risks to cede only within a defined class of risks, but the reinsurer is then required to accept each such ceded risk. Concomitantly, whereas in the case of facultative reinsurance the reinsurer is responsible for evaluating each risk that the primary insurer proposes to cede, in the case of facultative obligatory reinsurance the reinsurer is dependent on the underwriting skill, reputation, and good faith of the primary insurer in evaluating the ceded risk. *See, e.g.,* 11/06/09 AIG Letter at 2 n. 2; Second Amended Compl., 3/22/07 ("SAC") ¶¶ 21–22.

In its Second Amended Complaint filed on March 22, 2007, AXA alleged that AIG's brokers negotiating the Facilities, acting with knowledge that Albingia was not in a position to undertake the kind of review necessary to enter into purely facultative reinsurance contracts, induced Albingia to agree to the "slips" that ultimately formed the Facilities by falsely representing that the Facilities would be facultative obligatory, whereas in fact it was AIG's intent from the outset to treat them as facultative and thereby pawn off on AXA inferior policies that AIG knew AXA was in no position to evaluate. SAC ¶¶ 31–32, 38, 40, 60(a), 76(a); *see also* AXA Mem. Opp. Defs' Mot. for Summary Judgment, 4/11/07 ("AXA SJ Opp."), at 2–6, 13–14; Pretrial Consent Order, 1/7/08 ("PO"), ¶¶ 105–175, 282(a), 284–319.[4]

2. The parties' respective characterizations of these allegations derive primarily from the Second Amended Complaint, the Pretrial Consent Order, and the trial transcript and exhibits. AIG conceded to the Second Circuit that certain of the alleged misrepresentations relating to the 1998 Facility do not sound in contract, *see* 11/6/09 AIG Letter at 3 n. 2, and those misrepresentations will therefore not be addressed here.

3. Although the Court quotes AIG's descriptions of these allegations for the purposes of testing AIG's argument that these allegations were arbitrable, AXA's letter brief describes these allegations in terms more clearly couched in the language of fraud, as follows: (1) "AIG misrepresented its intention to treat the Facility as facultative obligatory"; (2) "AIG misrepresented its intention to adversely select risks to the detriment of its reinsurers"; and (3) "AIG concealed that it did not intend to keep any retention on the risks it planned to cede to the Facility." 11/6/09 AXA Letter at 1 n. 1. This is also the way AXA argued these allegations to the jury, and, in the Court's view, more accurately states the gist of the allegations.

4. Although the 1997 Facility was never memorialized in final "wordings," and neither of the "slips" specified whether the Facilities

*(2) The Adverse Selection Allegations.* In its Second Amended Complaint, AXA alleged that AIG and its brokers falsely represented that AIG "would cede risks that were written in accordance with AIG's 'blue chip' underwriting guidelines and reputation, and there would not be adverse selection," whereas, in fact, AIG used the Facility "as a dumping ground for risks that AIG would not underwrite for its own account," which caused Albingia to suffer massive losses. SAC ¶¶ 38, 40–41, 50, 60(b)-(c), 63, 68, 76(c). This second group of allegations is therefore closely intertwined with the first group, because for AIG to adversely select risks would be inconsistent with the notion of a facultative obligatory contract under which Albingia would rely entirely on AIG for underwriting decisions. *Id.; see also* AXA SJ Opp. at 9–11; PO ¶¶ 70, 74–75, 85, 120–21, 203–216, 282(c), 332–41.

*(3) The Risk Allocation Allegations.* AXA alleged in the Second Amended Complaint that AIG and its brokers also induced Albingia to enter into the 1997 Facility by falsely representing Albingia's exposure under that Facility would be limited to 20% of AIG's exposure to the underlying risks within the $10 million primary layer, and fraudulently induced Albingia to enter the 1998 Facility by falsely representing that Albingia's exposure would be limited to 25% of AIG's exposure for that Facility, whereas AIG always intended that AIG's share of the risk would be eliminated altogether. *See* SAC ¶¶ 40–41, 56–57, 60(d), 76(d). For example, a "worksheet" provided to Albin-

gia as part of the initial placement materials marketing the 1997 Facility to Albingia suggested that, with respect to each risk ceded under the Facility, Albingia's exposure to that risk would be limited based on AIG's share of that risk within the primary layer. *See* SAC ¶ 56; Adams Decl., Ex. B (Trial Ex. 15), at AXAV0005. AIG, however, never intended to have any exposure to losses in the primary layer whatever, but rather to pawn them off on Albingia and others. *See* AXA SJ Opp. 6–7; PO ¶¶ 78–79, 127, 176–202, 282(d), 320–331.

■ Against this background, the Court turns to the questions posed by the Summary Order. The Court of Appeals first asks the Court to determine whether the foregoing allegations "sound in contract" or "sound in fraud" under New York law. Implicit in this is the premise that if the allegations sound in fraud, they are outside the scope of the arbitration clauses in the two Facilities. The Court adopts that premise, but takes the liberty of further noting that the arbitration clauses here in issue are limited to disputes arising out of the *"interpretation"* of the contracts. The "parties may agree to limit the issues they choose to arbitrate," *Stolt–Nielsen, S.A. v. AnimalFeeds Int'l Corp.*, —— U.S. ——, 130 S.Ct. 1758, 1774, 176 L.Ed.2d 605 (2010), and arbitration clauses limited to interpretive disputes are widely understood to cover only those disputes that can be resolved by reference to the terms of the contract, *see, e.g., United Offshore Co. v. S. Deepwater Pipeline Co.*, 899 F.2d 405, 409–10 (5th Cir.1990); *Washburn v. So-*

would be treated as facultative or facultative obligatory, language was added to the 1998 "wordings" indicating that the 1998 Facility was facultative. However, AXA introduced evidence, which the jury credited, that this language was not binding because AIG added this language in a furtive and misleading manner, knowing that Albingia still believed

that the 1998 Facility was facultative obligatory. *See* PO ¶¶ 284–319. Based on such evidence, the jury concluded that the added language in the 1998 wordings did not change the outcome. The Court upheld this conclusion in its post-trial ruling. *AXA v. AIG*, 2008 WL 1849312, at *3 (S.D.N.Y. Apr. 22, 2008).

*ciete Commerciale de Reassurance,* 831 F.2d 149, 150–52 (7th Cir.1987). Indeed, construing the very same clause at issue here, the Iowa federal district court presiding over litigation between AIG and Farm Bureau Mutual Insurance Co. ("Farm Bureau"), involving the very same Facilities, specifically held that misrepresentation claims not unlike those advanced here were not arbitrable because they were not "disputes involving contract interpretation." *Farm Bureau v. AIG,* 2003 WL 21976034, at *2–4 (S.D.Iowa May 28, 2003).

■ The Second Circuit, in its summary order, offered the following overview of the distinction under New York law between fraudulent inducement and breach of contract claims:

> New York law distinguishes between "a claim based on fraudulent inducement of a contract" and a breach of contract claim. *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.,* 500 F.3d 171, 184 (2d Cir.2007). Merely falsely indicating an intent to perform under a contract "is not sufficient to support a claim of fraud under New York law." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 19 (2d Cir.1996); *see also Guilbert v. Gardner,* 480 F.3d 140, 148 (2d Cir.2007) (misrepresentations that pension plan was " 'taken care of' when, in fact, defendants knew this to be false" were merely duplicative of contract claim); *TVT Records v. Island Def Jam Music Group,* 412 F.3d 82, 90 (2d Cir.2005) ("[U]nder New York law, the failure to disclose an intention to breach is not actionable as a fraudulent concealment."), *cert. denied,* 548 U.S. 904, 126 S.Ct. 2968, 165 L.Ed.2d 951 (2006); *Manas v. VMS Assocs., LLC,* 53 A.D.3d 451, 453–54, 863 N.Y.S.2d 4 (1st Dep't 2008). "General allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support [a fraud] claim." *N.Y. Univ. v. Cont'l Ins. Co.,* 87 N.Y.2d 308, 639 N.Y.S.2d 283, 662 N.E.2d 763, 769 (1995) (holding that allegations of breach of contract "and any covenants implied" do not sound in fraud).
>
> To maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.

*Bridgestone/Firestone,* 98 F.3d at 20 (citations omitted); *see, e.g., Coppola v. Applied Elec. Corp.,* 288 A.D.2d 41, 42, 732 N.Y.S.2d 402 (1st Dep't 2001).

*AXA,* 348 Fed.Appx. at 629–630 (some citations omitted). To this helpful summary, this Court would add only that it is axiomatic that "a misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) and therefore involves a separate breach of duty." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.,* 500 F.3d 171, 184 (2d Cir.2007) (quoting *First Bank of the Americas v. Motor Car Funding, Inc.,* 257 A.D.2d 287, 292, 690 N.Y.S.2d 17 (1st Dep't 1999)).

The Court finds that the fraudulent inducement claim here is not duplicative of a hypothetical contract claim. The gist of AXA's single claim for fraudulent inducement is that in the course of the rapid exchanges typical of entering into "slips," AIG misrepresented numerous facts about the nature and value of the non-contractual arrangements they were offering to Albingia in order to induce Albingia to enter into the Facilities. Thus, AIG and its brokers misrepresented (1) that AIG

would treat the Facilities as facultative obligatory, even though they already knew that they would treat them as purely facultative (a matter not addressed at all in the slips); (2) that AIG would cede a reasonable cross-section of its risks to Albingia, even though they already knew that they would adversely select and unload unprofitable risks (again, a matter not addressed at all in the slips); and (3) that AIG would retain a certain amount of the primary layer risks, when they already knew that they would "dump" their active primary layer risks on Albingia and others (again, a matter not addressed at all in the slips). These misrepresentations involve much more than "an insincere promise of future performance." *First Bank*, 257 A.D.2d at 292, 690 N.Y.S.2d 17. They are representations that AIG knew were false at the time about various material matters outside the terms of the contracts themselves that nevertheless bore on the risk and value of the relationship and constituted collateral assurances without which Albingia would never have entered into the arrangements at all. As such, they state a fraudulent inducement claim.

AIG seeks to recast the interrelated thrust of these fraudulent inducement allegations—which at trial the parties on consent submitted to the jury as a single claim—by selectively citing snippets from AXA's various submissions to isolate component parts of these allegations that reference some aspect of the contractual language, and from these argues that the claim sounds in whole or part in contract. The Court finds this approach to be unavailing for several reasons.

To begin with, the mere fact that the allegations reference some of the contractual provisions is hardly dispositive. AXA's claim is not, as AIG would have it, that AIG concealed its secret intention to violate the terms of the contracts, but

rather that it misrepresented other, collateral aspects of how the arrangements between the parties would operate. Indeed, in pursuing its fraudulent inducement claim before the jury, AXA quite deliberately did not rely on AIG's compliance *vel non* with its contractual obligations. And upon examination of AXA's allegations, it becomes evident that contractual provisions do not control the claim.

As to the Facultative Obligatory Allegations, it is undisputed that the 1997 and 1998 "slips" were totally silent on whether the Facilities would be treated as facultative or facultative obligatory. Rather, which treatment would be utilized was a separate understanding *dehors* the contracts themselves, but made as an inducement to enter the contracts. To be sure, amendments to the "wordings" of the 1998 Facility added language that indicated, *inter alia*, that that Facility was facultative; but, as noted above, AXA introduced evidence, which the jury credited, that AIG and its brokers furtively and misleadingly inserted the relevant language knowing it would go unnoticed by Albingia and took great care to keep from Albingia the import of this change. This addition, therefore, was an irrelevancy except as further proof of the concealment of the fraud. *See AXA v. AIG*, 2008 WL 1849312, at *3 (S.D.N.Y. Apr. 22, 2008) (post-trial ruling); *see also In re CINAR Corp. Sec. Litig.*, 186 F.Supp.2d 279, 303 (E.D.N.Y.2002) ("It simply cannot be the case that any statement, no matter how false or fraudulent or pivotal, may be absolved of its tortious impact simply by incorporating it verbatim into the language of a contract.").

As to the Adverse Selection Allegations, neither the "slips" nor the 1998 "wordings" say anything about the nature of the risks that AIG would cede. Rather, once again, it was AIG's false representations of what it intended to do beyond the terms of the

contracts that fraudulently induced Albingia to contemplate entering into the Facilities. Although AIG argues that a contractually implied duty of good faith controlled its risk selection under the Facilities, AXA's fraudulent inducement claim did not contend that the adverse selection violated some generalized duty of good faith, but rather alleged a variety of specific collateral misrepresentations that AIG would cede only "blue chip" risks. This goes far beyond any claim of a mere breach of the duty of good faith.

As to the Risk Allocation Allegations, the issue might superficially appear closer, as some of the allegations do make reference to contractual provisions that speak to the method for calculating Albingia's share of the risk, see Adams Decl., Ex. F (Trial Ex. 40), at AXAV0055; id. Ex. J. (Trial Ex. 217), at AXAV1136. AIG further contends that AXA's allegations are based on the premise that AIG increased Albingia's exposure beyond what was provided in a "worksheet" attached to the initial placement materials and eventually appended to the 1997 Facility slip in slightly modified form. See SAC ¶¶ 56–58; Adams Decl., Ex. B (Trial Ex. 15), at AXAV0005; id. Ex. G. (Trial Ex. 42), at AXAV0040. But the calculation of Albingia's exposure is not at the heart of the Risk Allocation Allegations. Rather, the gist of those allegations, both as pleaded and as argued to the jury, was that AIG fraudulently concealed its intention to eliminate entirely its own primary layer exposure. See SAC ¶ 57; AXA SJ Opp. at 6–7; PO ¶¶ 188–192, 197; Trial Transcript ("Tr.") at 334–35 (testimony discussing concept of AIG's "net retention" and equating it to "having some skin in the game"); Keely Decl., Ex. 11 (Trial Ex. 13) (fax indicating that brokers intended to keep slip "silent" on retention); id. Ex. 18 (Trial Ex. 86) ("file note" indicating that AIG intended to keep "nil" retention). And these allegations are of a piece with, and inseparable from, the overall essence of AXA's fraudulent inducement claim, which is that AIG engaged in a series of misrepresentations to hide the fact that the Facilities were intended as a means for AIG to unload its unprofitable risks on reinsurers. For these reasons, even if certain contractual provisions govern the calculation of Albingia's share of the risk, the Court still finds that the Risk Allocation Allegations involve far more than assertions that AIG did not intend to abide by the contractually specified risk calculation mechanism, and therefore sound in fraud.

 For the foregoing reasons, the Court concludes that AXA's fraudulent inducement claim, both as a whole and with respect to the subsidiary allegations, sounds in fraud. Independently, moreover, even if New York law would treat these allegations as duplicative of a hypothetical contract claim, the Court would still find that the claim was not within the scope of the arbitration clause, because it does not "aris[e] out of the interpretation" of the contracts. As noted above, AXA's claim alleges misrepresentations independent of the provisions of the contracts, and AIG cannot point to any *interpretive* dispute with respect to any contractual term that forms the bases of the allegations that constitute AXA's fraudulent inducement claim. Even if under New York law a fraudulent inducement claim based on a party's nonperformance of contractual obligations is duplicative of a breach of contract claim, the claim does not necessarily implicate "interpretation" of the contract, and the claim here certainly does not.[5]

---

**5.** While the Summary Order assumes that New York law provides the rule of decision as to whether AXA's allegations sound in fraud or contract, federal law controls the question

■■ The final issue this Court must determine on remand is whether AIG waived arbitration, a finding that would be fatal to its arbitration demand even if one assumes, *arguendo*, that AXA's claim were at one point arbitrable. Although waiver of arbitration is "not to be lightly inferred," *PPG Indus., Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 107 (2d Cir.1997) (internal quotation marks omitted), nonetheless, waiver may occur, and determination of whether it has inevitably turns on the "particular facts of each case," *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 163 (2d Cir.2000) (emphasis omitted). Typically, however, the focus is on three factors: "(1) the time elapsed from commencement of litigation to the request for arbitration, (2) the amount of litigation (including any substantive motions and discovery), and (3) proof of prejudice." *Id.* (internal quotation marks omitted).

■ Accordingly, the Court must review the pertinent procedural history in some detail. This review is not confined to the history of this litigation alone; the waiver inquiry also encompasses "prior litigation of the same legal and factual issues as those the party now wants to arbitrate." *PPG Indus.*, 128 F.3d at 108 n. 2 (quoting *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 133 (2d Cir.1997)). Here, the Court finds it highly probative, if not dispositive, that prior to this litigation, AIG decided in the parallel *Farm Bureau* case not to seek arbitration of a nearly identical fraudulent inducement claim arising out of the same Facilities.

As noted above, Farm Bureau was another reinsurer that had participated in these Facilities. After Farm Bureau stopped its payments under the Facilities, AIG demanded arbitration in October 2002. Keely Decl., Ex. 4, at 3. On December 31, 2002, Farm Bureau filed a lawsuit against AIG in Iowa state court, which was thereafter removed to federal court. *Id.* Ex. 1, at 32. Initially, AIG, which was represented in Iowa by the same counsel that represented it before this Court, moved to stay the litigation in favor of arbitration. With respect to Farm Bureau's fraudulent inducement claims, AIG made much the same argument it makes here, arguing to the Iowa District Court that: "Looking past the fraud in the inducement trappings, Plaintiffs' complaint describes a disagreement about the nature of the insurance contracts that are reinsured and the allocation of losses and premiums under the Reinsurance Contracts." *Id.* Ex. 2, at 6. Farm Bureau responded that its fraud claims did not require the interpretation of contract terms. Resistance to Mot. to Stay, *Farm Bureau v. AIG*, No. 4:03 Civ. 10050(REL), D.I. 5 (S.D.Iowa Feb. 25, 2003). Agreeing with Farm Bureau, the Iowa District Court denied AIG's motion, concluding, as noted previously, that the arbitration clause was "relatively narrow" and that the misrepresentation claims were not disputes about contract interpretation. *Farm Bureau*, 2003 WL 21976034, at *2–4. The district court did, however, stay a count seeking a declaration of the amounts owed under the Facilities, as this determination required interpretation of the contract terms and was therefore arbitrable. *Id.* at *4. AIG did not appeal from this order.

---

of arbitrability where, as here, the arbitration agreement does not contain a choice of law provision specifically applying state law to issues of arbitrability. *See, e.g., Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 130–31 (2d Cir.1997). Thus, the question of whether any of the disputes involves "interpretation" of the terms of the contract is a matter of federal law. However, there is no reason to believe that the application of New York law to this issue would yield any different result.

To this point, the fraudulent inducement claims initially raised by Farm Bureau were somewhat different from those raised here, since they included, *inter alia,* allegations of misrepresentations regarding the historical performance of these and other Facilities. However, in April 2004, Farm Bureau moved for leave to amend its complaint to add additional allegations regarding AIG's precontractual representations as to how the instant Facilities would be handled. In particular, Farm Bureau sought to add allegations that are substantially similar to the Facultative Obligatory and Adverse Selection Allegations at issue in the instant litigation. AIG initially opposed the motion to amend, arguing, among other things, that these new allegations required the interpretation of contract terms, and hence were contrary to the premise of the May 28, 2003 order. AIG Resistance to Farm Bureau Mot. for Leave to File Amended Compl., *Farm Bureau,* D.I. 78 (S.D.Iowa May 18, 2004). The magistrate judge handling the motion granted Farm Bureau leave to file the amended complaint, but expressly without prejudice to AIG's ability to argue that the new claims were subject to arbitration. Keely Decl., Ex. 3, at 2.

However, on July 1, 2004, AIG, after what it represented was "careful consideration," moved to stay litigation only as to a count alleging a violation of the duty of utmost good faith, stating its belief that that allegation required interpretation of the contracts. *Id.* Ex. 4, at 5. Conversely, *AIG did not move to stay arbitration with respect to the Facultative Obligatory or Adverse Selection Allegations. Id.* Instead, it chose to litigate in federal court the claims predicated on those allegations, and in fact moved for summary judgment on the fraudulent inducement claims without asserting that such claims were arbitrable. *Id.* Ex. 5; AIG Mot. for Summary Judgment, *Farm Bureau,* D.I. 167

(S.D.Iowa Oct. 1, 2004). This alone may well constitute waiver, not just for the Farm Bureau action but for the instant action as well.

In any event, turning to the instant case, AIG first demanded arbitration against AXA on November 17, 2005, in order to recover unpaid balances under the Facilities after AXA stopped performing. Cotton Decl. ¶ 2 & Ex. A. In response, AXA filed its initial complaint on December 2, 2005. This complaint expressly referenced the Farm Bureau litigation as part of what prompted AXA's discovery of the fraud, Compl. ¶ 54, and under causes of action labeled "Intentional Misrepresentation" and "Material Nondisclosure," contained allegations substantially similar to both the fraudulent inducement claim as pleaded in the *Farm Bureau* amended complaint and the Facultative Obligatory and Adverse Selection Allegations as they were eventually pleaded in AXA's Second Amended Complaint, *id.* ¶¶ 35, 37, 53, 57–60, 76. Indeed, counsel for AXA at the time, Frederic W. Reif, Esq., attests that the *Farm Bureau* litigation is precisely what led AXA to suspect that Albingia had been fraudulently induced to enter into the Facilities, and that AXA's initial complaint was drafted using the *Farm Bureau* amended complaint as a model. Decl. of Frederick W. Reif, 11/5/09 ("Reif Decl."), ¶¶ 3, 8–9, 13. Furthermore, AXA sought access to the discovery in the *Farm Bureau* case, which was covered by a protective order, and obtained such access on December 30, 2005 after successfully moving to intervene in order to amend the protective order. *Id.* ¶¶ 5–6. On January 25, 2006, AXA filed its First Amended Complaint, which was essentially identical to its initial complaint except for removing certain AIG entities as parties.

Thereafter, Chief Judge Mukasey held a scheduling conference on March 24, 2006,

which appears not to have been recorded or transcribed. This Court is presented with two not entirely consistent accounts of that conference and the events leading up to it. According to AIG, shortly before the conference, Reif wrote to AIG's counsel at the time, Stuart Cotton, Esq., advising that AXA would be moving to stay the arbitration already instituted by AIG pending the litigation and requesting that AIG voluntarily stay that arbitration. Cotton Decl., Ex. B. Cotton attests that in response, he indicated that AIG would not agree to this request. *Id.* ¶ 6. According to Cotton, there was some discussion at the March 24 conference of AXA's request to stay arbitration, during which Judge Mukasey initially appeared to indicate that arbitration should proceed in tandem with the litigation. However, after Reif suggested that parallel proceedings would complicate discovery, Judge Mukasey, without further discussion and without stating a reason for his ruling, decided to stay arbitration. *Id.* ¶¶ 7–10.

AXA characterizes these events somewhat differently. Reif attests that prior to the March conference, Cotton affirmatively told him that AXA was "entitled to litigate its fraudulent inducement claims," and never indicated that he believed such allegations to be arbitrable. Reif Decl. ¶ 16. Reif further avers that Cotton advised him that AIG wanted to proceed with arbitration on a parallel track to litigation so that AIG's claims against AXA for unpaid bills could be quantified by the arbitrator, thus ascertaining the amount of damages in the event AXA was unsuccessful in obtaining rescission. Reif responded that parallel discovery would be wasteful and could delay litigation. *Id.* ¶ 17. He asserts that during the conference, the status of the arbitration was discussed, and Cotton "made clear that he was not seeking to stay litigation or any part of the litigation," but rather was seeking parallel arbitration to quantify the amount of AIG's claims. According to Reif, Judge Mukasey was persuaded by Reif's objections that parallel proceedings would delay the litigation by prolonging discovery, and indicated that he would stay arbitration to expedite the case. *Id.* ¶¶ 16–19.[6]

In any event, there is no dispute that Judge Mukasey entered a brief order on March 24 setting a discovery schedule, and, as to the arbitration, providing simply that "[f]urther steps in the arbitration proceeding heretofore commenced will be stayed pending further order of the court." Cotton Decl., Ex. C. AIG did not seek to appeal this order.

It was not until a year later, after close of discovery, that AIG made any demand for arbitration of the allegations that form AXA's fraudulent inducement claim. The case had by this time been reassigned to the undersigned and a schedule set for summary judgment motion practice. Shortly before summary judgment practice began, AXA, on March 22, 2007, filed its Second Amended Complaint. This complaint repeated the Facultative Obligatory and Adverse Selection Allegations contained in the earlier complaints, but for the first time developed in detail the allegations regarding AIG's intention to secretly eliminate its own retention of any primary layer risk, a matter that had emerged during discovery. In AIG's memorandum

---

**6.** Cotton has since submitted a reply declaration disagreeing with Reif's contentions that he agreed to stay arbitration pending litigation or that he intended arbitration to be limited to the quantification of the amount of open claims. Reply Decl. of Stuart Cotton, 11/18/09, ¶ 2. The Court need not resolve this or any other factual dispute relating to the March 24 conference, because these disputes are ultimately immaterial to the Court's determination of waiver.

of law in support of its summary judgment motion, which made a variety of arguments as to the merits of AXA's claims, the statute of limitations, and the availability of punitive damages, AIG devoted approximately one-half page to asserting that the claims were subject to arbitration "[t]o the extent these allegations have morphed into the manner in which the facilities functioned, or concern AIG's performance." AIG Mem. in Support of Mot. for Summary Judgment, 3/28/07, at 13–14. Implicit in this argument was a concession that no claim had been made for arbitration of the allegations set forth in the earlier complaints.

AXA responded by claiming that the new allegations were still related to an independent, non-arbitrable claim of fraudulent inducement (citing many of the same cases discussed herein) and by asserting that in any event, AIG had waived its right to arbitration by failing to seek an interlocutory appeal from Judge Mukasey's stay order. AXA SJ Opp. 15–18. In AIG's reply submission, it responded to the waiver argument, and characterized Judge Mukasey's order as "clearly contemplat[ing] that contract interpretation claims *would* be arbitrated, but after the rescission claims were resolved." AIG Reply Mem., 4/30/07, at 9. (By "rescission claims," AIG appears to have been referring to those of AXA's claims that, in AIG's view, were properly before the Court rather than the arbitrator. *Cf.* Tr. 1361 ("MR. COTTON: ... There are a number of issues that we had originally said do not belong in this case because they are not rescission is-

sues....")). This Court denied all summary judgment motions. Although the Court's Memorandum Order explaining its rulings did not provide discussion of AIG's arbitration argument, it did express the view, in the context of the availability of punitive damages, that "a claim for fraudulent inducement ... under established New York law, sounds in fraud not contract, and by definition precedes the formation of any contract." *AXA v. New Hampshire Ins. Co.*, 2007 WL 2142302, at *2 (S.D.N.Y. July 3, 2007) (citation omitted).

AIG again raised its current arbitration argument in one of its motions *in limine* filed a few weeks before trial. Specifically, in its six-page memorandum in support of a motion *in limine* "to preclude plaintiff from introducing evidence of contract claims," filed on December 28, 2007, AIG asserted that "it has become clear" that the fraudulent inducement allegations "are clearly claims for breach of contract" and should thus be arbitrated. AIG Mem. in Support of Mot. *in Limine*, D.I. 76, 12/28/08, at 1. The substance of this argument also came up at various points during the trial, and the Court consistently indicated its understanding that the fraudulent inducement claim being tried was distinct from claims arising out of contract interpretation. *See, e.g.*, Tr. 1470 (noting that if the rescission claim were denied, other contractual matters would go to the arbitrator); *id.* at 1604 (referencing prior rulings that, with a limited exception, evidence regarding subsequent performance on the contracts was irrelevant).[7]

---

7. At one point, the Court, after noting the lack of clarity in the record as to the basis for Judge Mukasey's order staying arbitration, *id.* at 1472, had a colloquy with Cotton as follows:

THE COURT: Now, one last thing. I started to raise this question: Among the cast of thousands who are assembled here,

was anyone present when Judge Mukasey heard argument on the stay?

MR. COTTON: Your Honor, not only was I present but I was at the wrong end of the ruling, in my view, and so I remember it.

THE COURT: Because I have always assumed, even though he issued no opinion in that case, that his reasoning was that the

After trial, the jury returned a verdict in AXA's favor on the fraudulent inducement claim and awarded AXA punitive damages. AIG did not raise its arbitration argument in its post-trial motion.

This background clarifies the answers to several of the Second Circuit's queries regarding waiver. First, as to "whether AIG pressed its contract/fraud distinction when opposing Judge Mukasey's stay of arbitration," *AXA*, 348 Fed.Appx. at 631, the answer is plainly "no." Second, as to "whether the basis for the stay encompassed this issue," *id.*, the answer is that, while the Court erroneously assumed in the colloquy set forth at footnote 7, *supra*, that that was the case, there is no indication of record that that was so, and, based on the parties' subsequent submissions as to what they respectively remember about the hearing before Judge Mukasey, his ruling appears more lately to have been based on the belief that the arbitration, which then related only to the calculation of amounts due to AIG, should be deferred until after trial of the claims set forth in AXA's complaint because allowing both proceedings to go forward simultaneously would complicate discovery.

Indeed, in its present papers, AIG does not appear to seriously argue that it mean-ingfully raised its contention that the fraudulent inducement claim should go to arbitration at any time prior to the summary judgment motion practice in this Court, well over a year after the case was filed and after the completion of all discovery. But AIG seeks to excuse this delay by arguing that it was only after the filing of AXA's Second Amended Complaint (shortly before summary judgment practice) that "AXA's allegations appeared to veer toward the contract realm." 11/06/09 AIG Letter at 8.

As already noted, the Court finds this argument to be wholly without merit. Not only did AXA's original and first amended complaints unmistakably raise the Facultative Obligatory and Adverse Selection allegations, *see, e.g.*, First Amended Compl. ("FAC") ¶¶ 33, 51, 55–56, 58, 74, but also they did so using language quite similar that previously used by Farm Bureau with respect to allegations that AIG, represented by the same counsel—after initially arguing for arbitration—consciously chose not to arbitrate, *compare id., with* Reif Decl., Ex. E (Farm Bureau Amended Compl.) ¶¶ 33, 37–39, 49–51, 67. The record thus refutes AIG's claim that it had no idea until the filing of AXA's Second Amended Complaint that AXA's fraudu-

---

arbitration contract did not cover, and could not be read to cover, a claim of fraudulent inducement, and that, therefore, since what was being asked for was rescission, that ought to be decided first because there would be nothing left for the arbitrators to determine if the contract had in fact been fraudulently induced.... Is that consistent with what you recollect?

MR. COTTON: Your Honor, that may be what he was thinking and it might have been implicit in what he articulated. We were within ... I would say a whisker of success ... and Mr. Reif ... stood up and he said, but if we go forward, it will interfere with speedy discovery and it will mess up this case. And that's when the whisker turned into a mile.

THE COURT: I see. I have to assume-and I'm not hearing anything that leads me to the contrary position-that the reason I have just articulated is what was in Judge Mukasey's head, and I've operated on that assumption throughout all of my rulings on this case.

*Id.* at 1628–29. Although it now appears to the Court that it imputed more to Judge Mukasey's ruling than the record will support, *see infra*, this colloquy is still important in its implicit confirmation that no demand for arbitration of the fraudulent inducement claim was made to Judge Mukasey, since the ongoing arbitration that Judge Mukasey stayed dealt with other issues.

lent inducement claims might implicate the very same contract/fraud distinction that its counsel pressed in 2003 with respect to Farm Bureau. While the Second Amended Complaint may have introduced the Risk Allocation Allegations and fleshed out other aspects of the fraudulent inducement claim, it is simply not the case that the essential nature of that claim "morphed," "veer[ed]," "metamorph[osed]," (*see* 11/6/09 AIG Letter at 8) or otherwise transmogrified at that time in a manner that would in any way excuse AIG's failure to pursue its arbitration claim at the outset of this litigation.

AIG's conduct after March 2007 further evinces its intention to keep its potential rights to arbitration in its back pocket. As is apparent from the colloquy quoted above in footnote 7, the Court had previously assumed that Judge Mukasey concluded that a claim for fraudulent inducement did not fit within the arbitration clause. AIG did nothing to refute that assumption, which was latent in the Court's memorandum order denying summary judgment, which was consistent with AIG's own characterization of that order in its summary judgment papers, and which was stated explicitly from the bench in Cotton's presence. It has since become clear to the Court that Judge Mukasey did not rule on the fraud/contract distinction. But rather than timely clarifying to the undersigned that those issues had not in fact been resolved by Judge Mukasey, AIG in effect attempted to preserve these arguments by tacking them onto its summary judgment motion and motions *in limine,* but never actually asking this Court to revisit Judge Mukasey's stay order.[8] This conduct unmistakably indicates that AIG has waived its right to arbitration.

AIG also attempts to argue that, even if its arbitration claim was made belatedly, the delay did not prejudice AXA. Yet, *at no time prior to trial,* if even then, did AIG actually move to send AXA's fraudulent inducement claim to arbitration. At most, it simply alluded to an argument for such referral, briefly and in passing, in its post-discovery summary judgment motion and eve-of-trial motion *in limine.* As the Second Circuit stated in finding such conduct prejudicial in *Demsey & Associates, Inc. v. S.S. Sea Star,* 461 F.2d 1009 (2d Cir.1972):

> The substantial expense to all concerned that was involved in the trial of all the factual and legal issues in the case ... was caused by [the defendant's] full participation in the pre-trial procedures and in the trial on the merits, despite its mere allegation of the arbitration clause ... as a defense. We think it would be a gross miscarriage of justice now to require a retrial by arbitration of any of these issues.

*Id.* at 1018. Similarly, in *Com–Tech Associates v. Computer Associates International, Inc.,* 938 F.2d 1574 (2d Cir.1991), the Second Circuit upheld a finding of prejudice under facts strikingly similar to those present here:

> The defendants did not assert the defense of arbitration in either of their answers. Defendants extensively deposed the plaintiffs. Shortly before the scheduled completion of discovery—a full eighteen months after answering the complaint, and only four months before the scheduled trial date—defendants first raised the issue of arbitration in an omnibus motion for judgment on the pleadings and partial summary

8. In its current papers, AIG concedes that its summary judgment motion was *not* a request to compel arbitration, but rather an attempt to have this Court dismiss the fraudulent inducement claim. 11/20/09 AIG Letter at 6–7.

judgment, thereby forcing plaintiffs to litigate arbitrable issues. These maneuvers put plaintiffs to considerable additional expense, and further delayed the proceedings. To permit litigants to participate fully in discovery, make motions going to the merits of their opponent's claims, and delay assertion of a contractual right to compel arbitration until the eve of trial defeats one of the reasons behind the federal policy favoring arbitration: that disputes be resolved without "the delay and expense of litigation."

*Id.* at 1576–77 (citations omitted).

Accordingly, the Court finds that further arbitration would cause immense prejudice to AXA and would unduly reward AIG for what can most charitably be characterized as sitting on its arbitral rights.

It remains only to add that AIG's waiver was knowing and intentional. As noted, AIG, from the moment AXA's complaint was filed, knew that this case involved fraudulent inducement allegations substantially similar to those in the *Farm Bureau* case, which, after considerable deliberation, it had ultimately decided in that case not to seek to arbitrate—a not-unreasonable decision given the narrowness of the arbitration clauses in issue. AIG did not even present this Court with its argument that the fraudulent inducement claim sounded in contract, and therefore could not be litigated, until almost sixteen months after the complaint was filed and after discovery was already completed. And in making this argument in a brief passage in its summary judgment motion, AIG sought only the dismissal of the claim rather than to compel its arbitration. Likewise, in its motion *in limine*, AIG never moved for referral to arbitration. Furthermore, when at trial it should have become clear to AIG's counsel that this Court had erroneously assumed that

Judge Mukasey's stay of arbitration was predicated on his finding that the fraudulent inducement claim was not covered by the arbitration clause, Cotton, who was present at that proceeding, did nothing to challenge this Court's assumption. The Court concludes that the foregoing facts, taken together, show that AIG's selective and late invocation of its arbitral rights was not a matter of negligence, but rather a strategic gambit meant to provide a second bite at the apple in the event that AIG lost in this Court.

In sum, the Court finds that AXA's fraudulent inducement claim was not arbitrable and, moreover, that AIG waived whatever arbitral rights it had. The Clerk of the Court is directed to forward these Findings and Conclusions to the Clerk of the Court of Appeals, with request that they be forwarded to the panel hearing Second Circuit docket number 08–2521–cv.

SO ORDERED.